575 S.E.2d 377

**STATE ex rel. Jesse H. RILEY, Petitioner,**

v.

**Edward RUDLOFF, Administrator of the Eastern Regional Jail; Darrell V. Mcgraw, Jr., Attorney General of the State of West Virginia; and Jerome Lovrien, Commissioner, West Virginia Department of Health and Human Resources, Bureau for Behavioral Health and Health Facilities, Respondents.**

No. 30725.

Supreme Court of Appeals of West Virginia.

Submitted Oct. 9, 2002.

Decided Dec. 6, 2002.

John P. Adams, Deborah A. Lawson, Public Defender Corporation, Charleston, West Virginia, Attorneys, for the Petitioner.

Attorney General, Stephen J. Small, Senior Assistant Attorney General, Charleston, West Virginia, Attorneys for the Respondent, Jerome Lovrien, Commissioner, West Virginia Department of Health and Human Resources Bureau for Behavioral Health and Health Facilities.

Chad M. Cardinal, General Counsel, Charleston, West Virginia, Attorney for the Respondent, Regional Jail Authority.

Berkeley County Prosecuting Attorney, Christopher C. Quasebarth, Assistant Prosecuting Attorney, Martinsburg, West Virginia, Attorneys for Amicus Curiae, State of West Virginia.

DAVIS, Chief Justice:

In this original proceeding in prohibition,[1] Jesse Riley, a pretrial detainee of the state who suffers from mental illness, complains that he has been denied his due process right to medical care by virtue of a provision in W. Va.Code § 27–5–2(a) (2002) (Supp.2002) prohibiting applications for involuntary hospitalization to be filed on behalf of incarcerated persons. Because we agree that the challenged provision of W. Va.Code § 27–5–2(a) is unconstitutional, we grant the writ as moulded.

## I.

### FACTUAL AND PROCEDURAL HISTORY

The petitioner, Jesse Riley, is a diagnosed paranoid schizophrenic. In mid–2002, Mr. Riley became noncompliant with his treatment program and, resultantly, grew increasingly violent toward family members, including his seventy-seven year old mother. Mr. Riley refused to voluntarily admit himself into a hospital. On June 30, 2002, Mr. Riley was arrested for domestic battery. Because he resisted arrest, he was also charged with two counts of obstructing an officer. He was transported to the Eastern Regional Jail.

His mother, Mrs. Riley, then attempted to initiate an involuntary hospitalization proceeding seeking to have her son placed in an appropriate mental health facility. However, respondent Jerome Lovrien, Commissioner (hereinafter "Commissioner Lovrien"), West Virginia Department of Health and Human Resources Bureau for Behavioral Health and Health Facilities (hereinafter "BHHF"), refused to accept her petition. He refused based upon W. Va.Code § 27–5–2(a) (2002) (Supp.2002),[2] as Mr. Riley was then in custody as a pretrial detainee.

After arriving at the Eastern Regional Jail (hereinafter "the Jail"), members of the jail's

---

1. Although this case was brought as a petition for writ of mandamus, we have concluded that this matter should be treated as a writ of prohibition. *See infra* Section II of this Opinion discussing standard for writ of prohibition.

2. In 2002, the West Virginia Legislature amended W. Va.Code § 27–5–2(a) to apparently exclude from involuntary commitment proceedings any adult who is incarcerated. The current statute states, in pertinent part,

 (a) Any adult person may make an application for involuntary hospitalization for examination of an individual *who is not incarcerated at the time the application is filed* when the

staff observed Mr. Riley exhibiting bizarre behavior. Consequently, they contacted psychologist Harold Slaughter.[3] Mr. Slaughter examined Mr. Riley and determined that he was a threat to himself and others, and that he required specialized treatment and diagnosis that was unavailable at the Jail. Based upon this determination, Mr. Slaughter also attempted to file an application for involuntary hospitalization. As with Mrs. Riley's application, Commissioner Lovrien refused Mr. Slaughter's application citing W. Va. Code § 27–5–2(a). Later, on July 11, 2002, and after a public defender had been appointed to represent Mr. Riley, an order was entered directing that Mr. Riley be evaluated at the Forensic Unit of the South Central Regional Jail. At the time of the filing of the instant petition, Mr. Riley was sixth on the waiting list for the Forensic Unit. It was estimated that it may take forty to forty-five days before a space became available for him. Mr. Riley asserts in his petition that his condition has not improved since his incarceration and, as of the date his petition was filed, he remained "floridly psychotic."

Commissioner Lovrien provides some background information relevant to the issues Mr. Riley raises. Commissioner Lovrien explains that "treatment" is provided at two locations for individuals who are only indicted for a crime, or who may be incompetent to stand trial, or who are guilty by reason of mental illness—William R. Sharpe Jr. Hospital in Weston (hereinafter "Sharpe"), and the Forensic Evaluation Unit at the South Central Regional Jail (hereinafter "the FEU"). Both facilities are restricted as to the number of patients they may serve. Commissioner Lovrien contends that, due to a variety of factors, courts have been committing more patients to both of these facilities in recent years. He also contends

that courts have been reluctant to discharge patients from Sharpe before the end of the release period[4] for reasons of public safety. Consequently, Sharpe has been operating at or above capacity and the FEU has a waiting list. When a court orders a defendant to Sharpe, Commissioner Lovrien explains, Sharpe must transfer one of its existing non-forensic patients to another psychiatric facility. Sharpe must also pay for the individual's care. Commissioner Lovrien asserts that BHHF is attempting to deal with the problem of the increased number of patients at Sharpe in several ways. For example, on May 3, 2001, BHHF sent a letter to all West Virginia judges urging them to renounce civil commitment as a means for jails and correctional facilities to satisfy their duty to provide mental health treatment to inmates. BHHF has also assembled a task force to address the increasing forensic service needs of the State.

On August 5, 2002, Mr. Riley filed with this Court an "EMERGENCY PETITION FOR WRIT OF HABEAS CORPUS AND/OR MANDAMUS." Subsequently, we entered an order in Vacation on August 16, 2002, awarding a writ of habeas corpus directing the Administrator of the Eastern Regional Jail to transfer Mr. Riley to the custody of Commissioner Lovrien, and directed him to admit Mr. Riley for treatment at an appropriate psychiatric hospital. In addition, we awarded a rule to show cause in mandamus, returnable on October 9, 2002. As noted below, however, we choose to treat the issues remaining in this case as arising in prohibition.

## II.

### STANDARD FOR WRIT OF PROHIBITION

■ This case was initially brought as a petition for writ of habeas corpus and/or

---

person making the application has reason to believe that:

(1) The individual to be examined is addicted, as defined in section eleven, article one of this chapter; or

(2) The individual is mentally ill and, because of his or her mental illness, the individual is likely to cause serious harm to himself or herself or to others if allowed to remain at liberty while awaiting an examination and certification by a physician or psychologist.

(Emphasis added).

3. Mr. Slaughter is a clinical psychologist who is under contract to provide mental health services at the Eastern Regional Jail.

4. The release period is the longest period for the offenses for which a patient was indicted.

mandamus. We granted the writ of habeas corpus, leaving for resolution only issues related to mandamus. Upon further consideration of the issues herein raised, however, we choose (as we have done in many appropriate cases) to treat this matter as a writ of prohibition. *See, e.g., State ex rel. Conley v. Hill,* 199 W.Va. 686, 687 n. 1, 487 S.E.2d 344, 345 n. 1 (1997) ("Although this case was brought and granted as a petition for mandamus, we choose to treat this matter as a writ of prohibition. *See State ex rel. Ranger Fuel Corp. v. Lilly,* 165 W.Va. 98, 100, 267 S.E.2d 435, 436 (1980); *see also Carr v. Lambert,* 179 W.Va. 277, 278[n. 1], 367 S.E.2d 225, 226 n. 1 (1988)."), *overruled in part on other grounds by State v. Hulbert,* 209 W.Va. 217, 544 S.E.2d 919 (2001).

■■■ Viewed in the context of a petition for writ of prohibition, Mr. Riley's argument may be interpreted as asserting that Commissioner Lovrien has exceeded his legitimate powers by refusing to accept applications seeking involuntary commitment of pretrial detainees. Accordingly, we apply the standard for prohibition set forth by this Court in syllabus point four of *State ex rel. Hoover v. Berger,*

> In determining whether to entertain and issue the writ of prohibition for cases not involving an absence of jurisdiction but only where it is claimed that the lower tribunal exceeded its legitimate powers, this Court will examine five factors: (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or

prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impression. These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue. Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight.

199 W.Va. 12, 483 S.E.2d 12 (1996).

## III.

## DISCUSSION

Mr. Riley argues that W. Va.Code § 27–5–2(a) is unconstitutional in that it violates his right to due process of law [5] by preventing him from receiving necessary medical treatment, in the form of involuntary hospitalization at an appropriate mental health facility, for his severe mental illness.[6]

Commissioner Lovrien responds that W. Va.Code § 27–5–2(a) is not unconstitutional. He explains that the West Virginia Code provides two distinct articles for the involuntary hospitalization of individuals with behavioral health problems. The commitment of persons charged or convicted of criminal activity is covered under Chapter 27, Article 6A,[7] while the involuntary hospitalization of

---

5. Mr. Riley has raised several arguments asserting that his constitutional rights have been violated by the Commissioner's refusal to provide him with adequate medical care for his severe mental health condition. Because we find that this case may be resolved on due process grounds, we need not address his remaining arguments.

6. This case arises in a rather peculiar posture. It appears contradictory that Mr. Riley asserts that his constitutional rights have been violated because he has been denied *involuntary* hospitalization. Due to Mr. Riley's impaired mental condition, however, he has been rendered unable to consent to mental health treatment. Consequently, the instant petition was filed on his behalf seeking the right to have him involuntarily

hospitalized. For purposes of clarity and ease of reference, however, we will refer to all arguments asserted on Mr. Riley's behalf as if they were his own.

7. Chapter 27, Article 6A addresses forensic mental health examinations, the commitment of persons who have been adjudicated not competent to stand trial, and commitment of those who have been found not guilty by reason of mental illness, mental retardation or addiction. We find Commissioner Lovrien's reliance on Chapter 27, Article 6A to be misplaced. Article 6A allows a circuit court to enter an order of commitment upon recommendation by an examining mental health professional only after a defendant has completed the procedure established for deter-

persons not so charged or convicted is laid out in Chapter 27, Article 5. He contends that the legislature has demonstrated its intention that there be no "mixing" of these two separate procedures by precluding, in W. Va.Code 27–5–2(a), the filing of an involuntary hospitalization application of a person who is incarcerated. Commissioner Lovrien further asserts that W. Va.Code § 27–5–2(a) is merely a clarification of the prior code wherein an involuntary application could be filed only against a person who was likely to cause serious harm to him or herself *"if allowed to remain at liberty."* The clarification of § 27–5–2(a) was required, Commissioner Lovrien submits, due to a common practice of ignoring the "at liberty" clause of the earlier version of the statute, which resulted in a significant number of incarcerated persons being sent to Sharpe under questionable circumstances and caused concern among the local community.

█ The Regional Jail and Correctional Facility Authority (hereinafter "the Jail Authority") responds that, although its medical unit generally provides state-of-the-art care, Mr. Riley requires specialized treatment and diagnosis that is simply beyond its capabilities. According to the Jail Authority, because Mr. Riley is a pretrial detainee the procedure for hospitalizing a convicted person pursuant to W. Va.Code § 28–5–31 (1980) (Repl.Vol.2001) does not apply. Moreover, since Mr. Riley is unable to consent to treatment, the only available procedure for hospitalizing him is through the state's mental hygiene system as set forth in W. Va.Code § 27–5–2(a). The Jail Authority agrees with Mr. Riley's contentions in this matter and joins him in asking this Court to find W.

Va.Code § 27–5–2(a) unconstitutional.[8] The Jail Authority submits that due process requires pretrial inmates to be provided access to health care. In this case, argues the Jail Authority, it tried to provide needed medical attention to Mr. Riley, but its attempts were thwarted by the provisions of W. Va.Code § 27–5–2(a). Finally, the Jail Authority submits that W. Va.Code § 27–5–2(a) creates an arbitrary third class of citizens who are denied total access to mental health care facilities simply because they are incarcerated and, in most cases, too poor to post bond.

█ Because Mr. Riley holds the status of a pretrial detainee in state custody, his federal constitutional challenge arises under the due process clause of the Fourteenth Amendment to the United States Constitution.[9] *See Olabisiomotosho v. City of Houston,* 185 F.3d 521, 525–526 (5th Cir.1999) ("The constitutional rights of a pretrial detainee flow from both the procedural and substantive due process guarantees of the Fourteenth Amendment ... which provides that no state shall 'deprive any person of life, liberty, or property, without due process of law....' U.S. Const. amend. XIV, § 5.)" (citing *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)); Syl. pt. 8, *Rush v. Wilder,* 263 Neb. 910, 644 N.W.2d 151 (2002) ("While a convicted prisoner's claim alleging inadequate medical care is brought under the Eighth Amendment, a pretrial detainee's claim alleging inadequate medical care is a due process claim."). *Cf. Loe v. Armistead,* 582 F.2d 1291, 1293–94 (4th Cir.1978) ("At the outset, we note that Loe was not a prisoner detained under a judgment of conviction; rather, he was a pretrial detainee. Under such circumstances, the protections that

mining whether he or she is competent to stand trial. This potentially lengthy procedure does not account for the acute needs of a pretrial detainee who requires immediate hospitalization because he or she has been deemed to be a threat to him or herself or to others.

8. The Jail Authority is a state agency having the responsibility, *inter alia,* of incarcerating pretrial detainees. *See* W. Va.Code § 31–20–2(*o*) (2001) (Supp.2002) (" 'Regional jail facility' or 'regional jail' means any facility operated by the authority and used jointly by two or more counties for the confinement, custody, supervision or control of adult persons ... awaiting trial ..."). Thus, we

pay particular attention to its arguments before us *Cf. Appalachian Power Co. v. State Tax Dep't,* 195 W.Va. 573, 582, 466 S.E.2d 424, 433 (1995) ("An inquiring court—even a court empowered to conduct *de novo* review—must examine a regulatory interpretation of a statute by standards that include appropriate deference to agency expertise and discretion.")

9. While we analyze this case under the due process clause of the Fourteenth Amendment to the United States Constitution, we note that our analysis also applies to due process rights arising under Article III, Section 10 of the Constitution of West Virginia.

apply to him are found in the due process clause of the fifth amendment, since he was a federal prisoner, rather than in the eighth amendment's prohibition against cruel and unusual punishment." (citations omitted)).

It has been explained that a constitutional challenge raised by a pretrial detainee may be classified as an attack upon either a "condition of confinement," or an "episodic act or omission." As one court has explained:

> We noted [in *Hare v. City of Corinth*, 74 F.3d 633 (5th Cir.1996) (en banc)] that determining which standard to apply in analyzing constitutional challenges by pretrial detainees hinges upon the classification of a challenge as an attack on a "condition of confinement" or as an "episodic act or omission." 74 F.3d at 644. A "condition of confinement" case is a "[c]onstitutional attack[] on general conditions, practices, rules or restrictions of pretrial confinement." *Id.*

*Scott v. Moore*, 114 F.3d 51, 53 (5th Cir.1997) (en banc). *See also Olabisiomotosho*, 185 F.3d at 526 ("We begin by deciding whether to classify the 'challenge as an attack on a "condition of confinement" or as an "episodic act or omission.'" The former category would include such claims as 'where a detainee complains of the number of bunks in a cell or his television or mail privileges.' The latter category, on the other hand, occurs 'where the complained-of harm is a particular act or omission of one or more officials.'").

■ Mr. Riley complains of a deprivation of adequate medical care that was not necessarily inflicted by a particular individual or on a particular occasion, but rather that W. Va.Code § 27–5–2(a) operates to systematically deprive him, as it would other pretrial detainees, of any chance of receiving medical care in the form of involuntary hospitalization. We find this complaint amounts to a challenge of his conditions of confinement. *See, e.g., Fredericks v. Huggins*, 711 F.2d 31, 33 (4th Cir.1983) (treating claim by pretrial detainees that they were unconstitutionally denied methadone detoxification as a "condition of confinement" claim). Because Mr. Riley herein challenges a condition of confinement, we apply "the reasonable relationship test of *Bell v. Wolfish*, 441 U.S. 520, 99

S.Ct. 1861, 60 L.Ed.2d 447 (1979)." *Scott*, 114 F.3d at 53.

As a foundation for its so called "reasonable relationship test," *Bell v. Wolfish* first explained that pretrial detainees may not be subjected to punishment.

> In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law, we think that *the proper inquiry is whether those conditions amount to punishment of the detainee....* A person lawfully committed to pretrial detention has not been adjudged guilty of any crime. He has had only a "judicial determination of probable cause as a prerequisite to [the] extended restraint of [his] liberty following arrest.... Under such circumstances, the Government concededly may detain him to ensure his presence at trial and may subject him to the restrictions and conditions of the detention facility so long as those conditions and restrictions *do not amount to punishment,* or otherwise violate the constitution.

441 U.S. 520, 535–37, 99 S.Ct. 1861, 1872–73, 60 L.Ed.2d 447, 466–67 (emphasis added) (internal citations omitted) (footnote omitted). *See also Frake v. City of Chicago*, 210 F.3d 779, 781 (7th Cir.2000) ("In this case it is Robert Frake's due process rights with which we are concerned. *He was a pretrial detainee, not found guilty of a crime, and therefore he could not be 'punished.'* For that reason, his treatment in the detention facility is analyzed under the Due Process Clause, rather than the Eighth Amendment's prohibition against cruel and unusual punishments." (emphasis added) (citing *Bell v. Wolfish,* ...)); *Duran v. Elrod*, 542 F.2d 998, 999 (7th Cir.1976) ("Strictly speaking, *pre-trial detainees may not be punished at all because they have been convicted of no crime.* The sole permissible interest of the state is to ensure their presence at trial. Following this reasoning, courts have held that suits by pre-trial detainees alleging conditions amounting to cruel and unusual punishment are better analyzed as due process attacks on conditions that exceed the sole

permissible state interest of ensuring presence at trial .... " (emphasis added)).

After clarifying that punishment may not be imposed upon pretrial detainees, *Bell* then described the test traditionally used in determining whether a governmental act is punitive in nature, or is merely a regulatory restraint that may be imposed prior to a determination of guilt:

"Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of *scienter*, whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned are all relevant to the inquiry, and may often point in differing directions."

441 U.S. at 537–38, 99 S.Ct. at 1873, 60 L.Ed.2d at 467–68 (quoting *Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 168–69, 83 S.Ct. 554, 567–68, 9 L.Ed.2d 644, 661 (1963)).

The Supreme Court in *Bell* went on to explain that

[t]he factors identified in *Mendoza–Martinez* provide useful guideposts in determining whether particular restrictions and conditions accompanying pretrial detention amount to punishment in the constitutional sense of that word. A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose.... Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on "whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]." ... *Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to*

*"punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees.*

441 U.S. at 538–39, 99 S.Ct. at 1873–74, 60 L.Ed.2d at 468 (emphasis added) (footnotes omitted) (internal citations omitted).

Another court, interpreting *Bell*, explained thusly:

The standard applicable to conditions of confinement claims by pretrial detainees was enunciated in *Bell v. Wolfish*, .... The proper inquiry is whether those conditions amount to punishment of the detainee, for, under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt. *Id.* at 535, 99 S.Ct. at 1871–72[, 60 L.Ed.2d at 466]. However, not every disability imposed during pretrial detention amounts to "punishment" in the constitutional sense. *Id.* at 537, 99 S.Ct. at 1873[, 60 L.Ed.2d at 467]. Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." *Id.* at 539, 99 S.Ct. at 1874[, 60 L.Ed.2d at 468]. The Government has legitimate interests that stem from its need to manage the facility in which the individual is detained. *Id.* at 540, 99 S.Ct. at 1874–75[, 60 L.Ed.2d at 469]. Furthermore, there is a *de minimis* level of imposition with which the Constitution is not concerned. *Id.* at 539 n. 21, 99 S.Ct. at 1874 n. 21[, 60 L.Ed.2d at 469 n. 21].

*Smith v. Copeland*, 87 F.3d 265, 268 (8th Cir.1996).

■ Analyzing W. Va.Code § 27–5–2(a) under the forgoing framework, we must determine if the complained of state action bears a rational relationship to a legitimate governmental purpose. Before deciding whether there is a legitimate purpose for the state action at issue, we more closely examine what exactly is that action.

" 'Where the language of a statute is free from ambiguity, its plain meaning is to be accepted and applied without resort to interpretation.' Syl. Pt. 2, *Crockett v. Andrews*, 153 W.Va. 714, 172 S.E.2d 384 (1970)." Syl. pt. 4, *Syncor Int'l Corp. v. Palmer*, 208 W.Va. 658, 542 S.E.2d 479 (2001).

Syl. pt. 4, *Charter Commun. VI, PLLC v. Community Antenna Serv., Inc.*, 211 W.Va. 71, 561 S.E.2d 793 (2002). The Language of W. Va.Code § 27-5-2(a) is plain in expressly excluding incarcerated persons from those who may be the subject of an involuntary hospitalization application:

(a) Any adult person may make an application for involuntary hospitalization for examination of an individual *who is not incarcerated at the time the application is filed* when the person making the application has reason to believe that: ...

(Emphasis added).[10] In practical application, however, this exclusion is limited to pretrial detainees, as there are other provisions in the Code providing for the involuntary hospitalization of incarcerated convicts. *See* W. Va.Code § 28-5-31. Moreover, this provision categorically excludes pretrial detainees from access to this type of medical care regardless of how serious their mental health condition may be, or how urgent their need for care.

■■■ It is clearly established that, due to the limited purpose for which one may be detained prior to a conviction, which is merely to ensure presence at trial, the protections afforded pretrial detainees are *at least* as great as those afforded convicts under the Eighth Amendment. "[Fourteenth Amendment] due process is *at least* co-extensive as the guarantees of the eighth amendment." *Loe*, 582 F.2d at 1294 (emphasis added) (citation omitted). *See also Duran*, 542 F.2d at 999-1000 ("We hold that as a matter of due process, pre-trial detainees may suffer no more restrictions than are reasonably necessary to ensure their presence at trial. While the decisions that have interpreted the Cruel and Unusual Punishment Clause may be valuable by analogy as defining that which may never be imposed on any inmate, wheth-

er convicted prisoner or pre-trial detainee, a more stringent standard controls the treatment by the state of pre-trial detainees. Since they are convicted of no crime for which they may presently be punished, the state must justify any conditions of their confinement solely on the basis of ensuring their presence at trial. Any restriction or condition that is not reasonably related to this sole stated purpose of confinement would deprive a detainee of liberty or property without due process, in contravention of the Fourteenth Amendment."); *Rush*, 644 N.W.2d at 157 ("While a convicted prisoner's claim alleging inadequate medical care is brought under the Eighth Amendment, a pretrial detainee's claim alleging inadequate medical care is a due process claim.... In general, however, the claims are analyzed in the same manner,.... Thus, the analysis to be conducted would be the same regardless of whether [the] claim is brought under the 8th or 14th Amendments." (citations omitted)).

■■■ The fact that the protections afforded pretrial detainees under the Fourteenth Amendment are at least commensurate with Eighth Amendment protections granted convicts is significant as

the [United States] Supreme Court has held that the eighth amendment prohibition against cruel and unusual punishments, applicable to the states via the fourteenth amendment, *requires states to provide medical care* for those whom it is punishing by incarceration. *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976)....

*Wideman v. Shallowford Comm. Hosp., Inc.*, 826 F.2d 1030, 1034 (11th Cir.1987) (emphasis added). Thus, the State may not deprive pretrial detainees of adequate medial care. Here, however, W. Va.Code § 27-5-2(a) plainly deprives pretrial detainees of adequate medical care when their mental health condition is so severe as to require involuntary hospitalization.

Upon finding deprivation of medical care, we must next consider whether the provision of W. Va.Code § 27-5-2(a) excluding pretrial

**10.** *See supra* note 2 for complete text of W. Va.Code § 27-5-2(a).

detainees from access to involuntary hospitalization procedures is reasonably related to a legitimate governmental objective. *See Bell,* 441 U.S. at 538–39, 99 S.Ct. at 1873–74, 60 L.Ed.2d at 468–69. *See also Scott,* 114 F.3d at 53 ("Under *Wolfish,* 441 U.S. at 539, 99 S.Ct. at 1874[, 60 L.Ed.2d at 468–69], a constitutional violation exists only if we then find that the condition of confinement is not reasonably related to a legitimate, non-punitive governmental objective." (citation omitted)); *Duran,* 542 F.2d at 1001 ("Pre-trial detainees are by definition deprived of their liberty, and such deprivation is without due process except to the extent it is necessary to serve important state interests.").

Commissioner Lovrien appears to assert that the purpose behind the exclusion of pre-trial detainees from access to involuntary hospitalization procedures under W. Va.Code § 27–5–2(a) is a measure to combat overcrowding of the mental health care facilities, and to prevent involuntary hospitalization to be improperly used to send "a significant number of incarcerated persons" to "Sharpe Hospital under somewhat doubtful circumstances." We do not find these purposes rationally related to the exclusion of pretrial detainee's from involuntary hospitalization procedures. First, simply allowing an application for the involuntary hospitalization of a pretrial detainee to be filed does not mean that the detainee will automatically he hospitalized. Rather, the application merely initiates a gatekeeping process whereby the Commissioner can then evaluate whether the detainee should be involuntarily hospitalized. It is this evaluation process that is the proper avenue for reducing the number of improper involuntary hospitalizations.

Furthermore, while Commissioner Lovrien contends that W. Va.Code § 27–5–2(a) is a measure to combat overcrowding of the mental health care facilities, the Jail Authority informed us during oral argument that, although there were thirty-three thousand inmates housed in the Regional Jails during the last calendar year, only twenty requests were made for transfer to a psychiatric facility. The Jail Authority also opined that it anticipated the same low numbers for the next calendar year.[11] Thus, we do not find Commissioner Lovrien's overcrowding argument persuasive.

■■■ We are likewise unpersuaded by Commissioner Lovrien's assertion that the Jail Authority is required to provide psychiatric services for those in its custody, and, correspondingly, to the extent that Mr. Riley has been deprived of medical care, that culpability lies with the Authority. It is undisputed that the State has a duty to provide medical care—which includes necessary and adequate psychiatric and psychological services. *See Gibson v. County of Washoe,* 290 F.3d 1175, 1187 (9th Cir.2002) ("Th[e] duty to provide medical care encompasses detainees' psychiatric needs."); *Rodney v. Romano,* 814 F.Supp. 311, 312 (E.D.N.Y.1993) ("[A] pretrial detainee, has at least as great a right to adequate medical treatment as that of a sentenced inmate. In addition, pretrial detainees, like sentenced inmates, are entitled to psychiatric and psychological care.") (emphasis omitted). *See also Riddle v. Mondragon,* 83 F.3d 1197, 1202 (10th Cir.1996) (finding that under the Eighth Amendment "[t]he states have a constitutional duty to provide necessary medical care to their inmates, including psychological or psychiatric care."); *Partridge v. Two Unknown Police Officers,* 791 F.2d 1182, 1187 (5th Cir.1986) ("Under the *Bell v. Wolfish* standard, the defendants had a duty, at a minimum, not to be deliberately indifferent to Partridge's serious medical needs. A serious medical need may exist for psychological or psychiatric treatment, just as it may exist for physical ills." (footnote omitted)). Indeed, as the Fourth Circuit has said in a holding with which we are in agreement, "[w]e see no underlying distinction between the right to medical care for physical ills and its psychological or psychiatric counterpart." *Bowring v. Godwin,* 551 F.2d 44, 47 (4th Cir.1977). "The key factor in determining whether a system for psychological or psychiatric care in a jail or prison is constitutionally adequate is whether inmates with serious mental or emotional illnesses or disturbances are provided reasonable access to medical personnel qualified to diagnose and treat such illnesses or distur-

11. The Jail Authority noted that these numbers did not include the various county jails.

bances." *Inmates of the Allegheny County Jail v. Pierce*, 612 F.2d 754, 763 (3d Cir. 1979). In short, "when inmates with serious mental ills are effectively prevented from being diagnosed and treated by qualified professionals, the system of care does not meet ... constitutional requirements ... and violates the Due Process Clause." *Id.*

We understand and recognize that occasions will arise where the Jail Authority is simply ill equipped to provide for the medical needs of a given inmate. In this case, the Jail Authority, through its evaluating psychologist, determined that Mr. Riley's needs were beyond its capabilities. Under review of an application for involuntary hospitalization, Commission Lovrien could have considered whether the Jail's determination was accurate. However, because Mr. Riley is statutorily denied the opportunity to even make an application, no such review can occur.

Finally, we note that the Prosecuting Attorney who is trying the underlying criminal case filed an *amicus curiae* brief in this case, asserting that the exclusion of pretrial detainees from the application process for involuntary hospitalization is rationally related to the government purpose of ensuring the public safety by removing from the public those individuals who have been alleged to pose a danger of serious harm because of a mental illness. The Prosecuting Attorney contends that because a mentally ill pretrial detainee is in custody, the detainee does not pose a risk of serious harm to others. This argument ignores the fact that the State has an affirmative duty to provide medical care to those in its custody.

 Courts have recognized that generally a state is under no affirmative obligation to provide protective services.

Several court of appeals decisions have addressed the issue of whether a state or municipality has a duty under the fourteenth amendment to provide various protective services to its citizens. Almost without exception, these courts have concluded that governments are under no constitutional duty to provide police, fire or other public safety services.

*Wideman*, 826 F.2d at 1033–34. Indeed, in an authoritative ruling on this issue, the United States Supreme Court said, "our cases have recognized that the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *DeShaney v. Winnebago County Dep't of Soc. Serv.*, 489 U.S. 189, 196, 109 S.Ct. 998, 1003, 103 L.Ed.2d 249, 259 (1989).[12] However, it has been recognized that where there is a special relationship between an individual and the state, certain rights may arise, such as the right to medical care:

> Both the Supreme Court and various circuit courts have indicated that the existence of a "special custodial or other relationship" between an individual and the state may trigger a constitutional duty on the part of the state to provide certain medical or other services. In these special circumstances, the state's failure to provide such services might implicate constitutionally protected rights.

*Wideman*, 826 F.2d at 1034. Elaborating on this "special relationship" principal, *Wideman* explained:

> The primary thread weaving these special relationship cases together is the notion that
>
>> if the state takes a person into custody or otherwise assumes responsibility for that person's welfare, a "special relationship" may be created in respect of that person, and the fourteenth amendment imposes a concomitant duty on the state to assume some measure of responsibility for the person's safety and well-being.

12. The due process clauses to which *DeShaney* refers are the fifth amendment's clause (applicable to the federal government) and the fourteenth amendment's clause (applicable to the states). *See Rutherford v. City of Newport News*, 919 F.Supp. 885, 893 n. 10 (E.D.Va.1996) ("The Fifth Amendment's due process clause applies to the Federal Government. The clause in the Fourteenth Amendment applies to states and municipalities. The rights protected by the two clauses are co-extensive." (citation omitted)).

826 F.2d at 1035 (citation omitted). *Wideman* also provided examples of when the special relationship has been deemed to arise. Notably, it has been found to arise in the context of a pretrial detainee:

> Courts have ... recognized the existence of a special relationship imposing a duty on a state or municipality to provide care and treatment for persons in its custody in situations less extreme than permanent incarceration or institutionalization. In *Hamm v. DeKalb County*, 774 F.2d 1567 (11th Cir.1985), *cert. denied*, [475] U.S. [1096], 106 S.Ct. 1492, 89 L.Ed.2d 894 (1986), this court concluded that the due process clause of *the fourteenth amendment mandates that pretrial detainees must be provided with at least minimally adequate* levels of food, living space, and *medical care*, just as the eighth amendment requires such standards for convicted prisoners. *Id.* at 1573.

826 F.2d at 1034 (emphasis added). In the instant case, Mr. Riley was taken into custody by the State, which created a special relationship giving rise to a duty upon the State to assume responsibility for Mr. Riley's welfare, namely—to provide him with at least minimally adequate levels of, *inter alia*, medical care. Moreover, *Wideman* concluded by explaining that "a constitutional duty can arise only when a state or municipality, by exercising a significant degree of custody or control over an individual, places that person in a worse situation than he would have been had the government not acted at all." 826 F.2d at 1035. By virtue of excluding pretrial detainees from participating in the process for involuntary hospitalization, the State has worsened the situation for those in its custody who suffer from severe mental health conditions.

 We are mindful that,

"In considering the constitutionality of a legislative enactment, courts must exercise due restraint, in recognition of the principle of the separation of powers in government among the judicial, legislative and executive branches. Every reasonable construction must be resorted to by the courts in order to sustain constitutionality, and any reasonable doubt must be resolved in favor of the constitutionality of the legislative enactment in question. Courts are not concerned with questions relating to legislative policy. The general powers of the legislature, within constitutional limits, are almost plenary. In considering the constitutionality of an act of the legislature, the negation of legislative power must appear beyond all reasonable doubt." Syllabus Point 1, *State ex rel. Appalachian Power Company v. Gainer*, 149 W.Va. 740, 143 S.E.2d 351 (1965).

Syl. pt. 4, *McCoy v. VanKirk*, 201 W.Va. 718, 500 S.E.2d 534 (1997). However, we also recognize that, "[p]risoners are no one's constituents and weld little, if any, political clout. Consequently, society frequently forgets about, or even ignores these people, its unfortunate charges. It is therefore incumbent upon this Court ever to be vigilant in the protection of their legal rights." *Ray v. McCoy*, 174 W.Va. 1, 4, 321 S.E.2d 90, 93 (1984). Thus, based upon our analysis, we are constrained to hold that insofar as the "incarcerated persons" language of W. Va. Code § 27–5–2(a) (2002) (Supp.2002) operates to wholly exclude pretrial detainees in state custody from participating in the application process for involuntary hospitalization, it is unconstitutional as it violates the due process right of such detainees to receive medical care.

## IV.

## CONCLUSION

Having found that the provision of W. Va. Code § 27–5–2(a) excluding "incarcerated persons" from participating in the application process for involuntary hospitalization is unconstitutional, we accordingly grant the requested writ as moulded and order that Commissioner Lovrien is prohibited from rejecting applications for involuntary hospitalization submitted on behalf of pretrial detainees based solely on the fact of the detainees' incarceration.

Writ granted as moulded.

Justice STARCHER concurs and reserves the right to file a concurring opinion.

STARCHER, Justice, concurring.

(Filed Jan. 6, 2003)

I concur with the majority opinion authored by Chief Justice Davis and I appreciate its thorough and sound reasoning. Obviously, pre-trial detainees cannot be singled out and denied basic medical attention to treat their illnesses.

I write separately to call attention to an important decision of Wisconsin's highest court, *In re the Commitment of Dennis H.*, 255 Wis.2d 359, 647 N.W.2d 851 (2002), in which case the court's opinion discusses issues and principles that are significantly related to the "mental hygiene" issues in the instant case, and that should inform our future jurisprudence in this area.

Specifically, *Dennis H.* contains an up-to-date discussion of a number of constitutional issues that are often involved in considering statutes that govern when the state takes action to assure treatment for people who have severe mental illnesses, as applied to Wisconsin's statutory "fifth standard" for state action, which applies when a person's

> ... mental illness renders them incapable of making informed medication decisions and makes it substantially probable that, without treatment, disability or deterioration will result, bringing on a loss of ability to provide self-care or control thoughts or actions. It allows the state to intervene with care and treatment before the deterioration reaches an acute stage, thereby preventing the otherwise substantially probable and harmful loss of ability to function independently or loss of cognitive or volitional control. There is a rational basis for distinguishing between a mentally ill person who retains the capacity to make an informed decision about medication or treatment and one who lacks such capacity. The latter is helpless, by virtue of an inability to choose medication or treatment, to avoid the harm associated with the deteriorating condition.

255 Wis.2d at 382–83, 647 N.W.2d at 861–862.

The *Dennis H.* opinion states:

> "The state has a legitimate interest under its *parens patriae* powers in providing care to its citizens who are unable to care for themselves." *Addington v. Texas*, 441 U.S. 418, 426, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). The state also has "authority under its police power to protect the community" from any dangerous mentally ill persons. *Heller*, 509 U.S. at 332, 113 S.Ct. 2637, 125 L.Ed.2d 257 (citing *Addington*, 441 U.S. at 426, 99 S.Ct. 1804, 60 L.Ed.2d 323). The state's legitimate interest ceases to exist, however, if those sought to be confined "are not mentally ill or if they do not pose *some* danger to themselves or others." *Addington*, 441 U.S. at 426, 99 S.Ct. 1804, 60 L.Ed.2d 323 (emphasis added).

"[E]ven if there is no foreseeable risk of self-injury or suicide, a person is literally 'dangerous to himself' if for physical *or other reasons* he is helpless to avoid the hazards of freedom either through his own efforts or with the aid of willing family members or friends." *O'Connor v. Donaldson*, 422 U.S. 563, 574, n. 9, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975) (emphasis added). Substantive due process has not been held to require proof of imminent physical dangerousness to self or others as a necessary prerequisite to involuntary commitment.

It is well-established that the state "cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends." *Id.* at 576, 647 N.W.2d 851, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396; *see also Foucha v. Louisiana*, 504 U.S. 71, 78, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992) (involuntary mental health commitment is improper absent a determination of current mental illness and dangerousness). This does not mean, however, that substantive due process requires the state to restrict the scope of its mental health commitment statutes to only those individuals who are imminently physically dangerous. There is no "single definition that must be used as the mental condition sufficient for involuntary mental commitments." *Post*, 197 Wis.2d at 304, 541 N.W.2d 115. In this complicated and difficult area, the Supreme Court "has wisely

left the job of creating statutory definitions to the legislators who draft state laws." *Id.*

The fifth standard permits commitment only when a mentally ill person needs care or treatment to prevent deterioration but is unable to make an informed choice to accept it. This must be "demonstrated by both the individual's treatment history" and by the person's "recent acts or omissions." Wis. Stat. § 51.20(1)(a)2.e. It must also be substantially probable that if left untreated, the person "will suffer severe mental, emotional or physical harm" resulting in the loss of the "ability to function independently in the community" or in the loss of "cognitive or volitional control." *Id.* Only then may the individual be found "dangerous" under the fifth standard.

The fifth standard thus fits easily within the *O'Connor* formulation: even absent a requirement of obvious physical harm such as self-injury or suicide, a person may still be "dangerous to himself" if "he is helpless to avoid the hazards of freedom either through his own efforts or with the aid of willing family members or friends." *O'Connor*, 422 U.S. at 574, n. 9, 95 S.Ct. 2486, 45 L.Ed.2d 396.

Moreover, by requiring dangerousness to be evidenced by a person's treatment history along with his or her recent acts or omissions, the fifth standard focuses on those who have been in treatment before and yet remain at risk of severe harm, *i.e.*, those who are chronically mentally ill and drop out of therapy or discontinue medication, giving rise to a substantial probability of a deterioration in condition to the point of inability to function independently or control thoughts or actions. *See* Darold A. Treffert, *The MacArthur Coercion Studies: A Wisconsin Perspective*, 82 Marq. L.Rev. 759, 780 (1999). The statute represents the fruition of the efforts of the Wisconsin State Medical Society and the Alliance for the Mentally Ill, professional organizations which recognized a need for

a law that could be applied to those victims of mental illness who fell through the cracks under the old statutory scheme. *See id.*

\* \* \*

By permitting intervention before a mentally ill person's condition becomes critical, the legislature has enabled the mental health treatment community to break the cycle associated with incapacity to choose medication or treatment, restore the person to a relatively even keel, prevent serious and potentially catastrophic harm, and ultimately reduce the amount of time spent in an institutional setting. This type of "prophylactic intervention" does not violate substantive due process.

255 Wis.2d 359, 386, 647 N.W.2d 851, 863–864 (paragraph numbers omitted).

Consistent with the approach approved by the Wisconsin court, our Legislature in 2001 modified the language of our mental hygiene statute to specifically authorize hospitalization and treatment under our mental hygiene system if a person's mental illness has resulted in conditions such that *serious physical or mental debilitation will ensue "unless adequate treatment is afforded."* W.Va.Code, 27–1–12 [2001] (emphasis added).

Science's understanding of the physical and biological aspects of brain disorders is growing by leaps and bounds. Our law must keep pace, and assure that the stigma attached to "mental" illness, that has hampered equal treatment in the past, is erased.[1]

West Virginia's explicit adoption of a "need-for-treatment"-based standard, like the standard discussed in the *Dennis H.* opinion, is particularly important and timely in light of the current medical consensus that injuries to brain function from severe, untreated episodes of acute mental illness are long-lasting and may be permanent. No one should have to suffer permanent brain injury because of archaic distinctions between mental and physical illnesses.

---

1. The "physical" versus "mental" illness distinction has become so blurred as to be almost useless. But due to the survival of this often stigmatizing distinction, a patient's inability to "consent to treatment" because they are dement-
ed from a high fever from influenza would not ordinarily be seen as legally impeding a doctor from administering therapeutic medicine—as it often would in the case of dementia caused by acute schizophrenia.

Roughly two out of every one hundred persons will suffer from one of the two most serious brain disorders, bipolar disorder or schizophrenia, during their lifetime; in most cases, the illness is chronic. Thanks to medications and other treatments that have been introduced in the past fifty years (and even better ones are in the works), the large majority of people with these illnesses can manage the symptoms of these illnesses sufficiently to live safely and productively outside of hospital or other institutional settings.

However, it is a fact in every society that a substantial number of persons who have been diagnosed as having these serious brain disorders—and this includes thousands of West Virginians—have difficulty sustaining compliance with prescribed treatment and medication regimes. *See generally, "I'm Not Sick—I Don't Need Help: Helping the Seriously Mentally Ill Accept Treatment—a Practical Guide for Families and Therapists,"* Xavier F. Amador and Anna–Lica Johanson, Vida Press (2000).[2]

The reasons for a person's "non-compliance" with prescribed treatment and medication are usually overlapping and multifaceted. Many people—certainly not just people who have brain disorders—do not take prescribed medications or otherwise fully comply with their doctor's treatment recommendations. Medications and treatments may have undesirable side effects, and/or may be costly or unavailable. A person who is feeling okay while taking medication may be tempted to stop, in hopes that severe symptoms will not recur. Medical and social support that can help people comply with prescribed treatment regimes is often woefully lacking.

Additionally, experts estimate that many people who suffer from serious brain disorders—some say up to 50%—have, *as a neurologically-based component of their illness,* a lack of insight into the very fact they have an illness. (Clinically, this lack of insight is called "anosognosia.")

Obviously, if not appreciating that one has an illness is part of one's clinical symptomatic picture, sustained medication and treatment compliance can be difficult, especially if the patient's family or other social support system is not strong—a condition that describes far too many people. And of course, if an individual with a mental illness starts moving into significant delusion or psychosis, they are further deprived of their reasoning ability.[3]

Therefore, although there are treatments and medications that in most cases could prevent the need for many hospitalizations, once a person's illness has been correctly diagnosed and treatment prescribed, in fact "revolving-door," recurring/repeat hospitalizations of persons with serious, chronic mental illnesses—for short-term treatment, to treat and alleviate acute symptoms like psychosis—are a fact of life in every industrialized nation. And in West Virginia, it is ordinarily in our mental hygiene system in which these recurring, short-term hospitalizations are authorized.

It is important to realize that for a number of seriously ill patients who may in fact be *willing* to accept hospitalization for treatment, the "involuntary hospitalization" process that is the core of the mental hygiene system is nevertheless utilized—precisely because our state psychiatric hospital system is so overstressed that they cannot accept a voluntary admission patient. And many people, deplorably, have no health insurance that would allow them to enter a private hospital.

Where there are comprehensive, community-based, assertive treatment programs, no doubt many hospitalizations for acute episodes of mental illness could be avoided. But such programs are costly and regrettably not to be found everywhere. And impor-

---

2. Support for the general factual statements about mental illness and treatment in this separate opinion can be found in this book, and in almost any recent book on the subject. Further citations for such factual statements will be omitted, as they are included in this discussion to make general points and not to resolve particular issues in the instant case.

3. Of course, medication noncompliance is not the only reason for severe psychiatric episodes that lead to mental hygiene proceedings. Situations, factors, and conditions like substance abuse, addiction, family violence, and dual diagnoses can create grounds for the dangerousness to self or others (active or passive) and need for treatment that are the legal foundation for the mental hygiene process.

tantly, a lack of community services is *in no way* a reason or excuse for denying to ill people who are in crisis the treatment that they need—in hospitals, if that is the treatment that is available.

In West Virginia, I believe that our doctors, psychologists, social workers, law enforcement, courts, hospitals, and judiciary are trying to do the best they can, using the mental hygiene system, to get treatment to people who need it in a constitutional and therapeutic way.

To reiterate: as a society, we should ideally minimize the need for mental hygiene proceedings to get effective treatment for people with mental illnesses. But when we use these procedures—because they are what we have—they must be as fair and humane as possible—and available to all. The Court's opinion in the instant case takes this approach, holding that the status of being a pre-trial detainee does not deny to a person the same right to treatment that others have; and it reaches that result by applying clear principles of law.

Accordingly, I concur.