IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2025 Term

_____

No. 24-547

_____

FILED

**November 12, 2025**

released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

STATE OF WEST VIRGINIA EX REL. AARON JIMMIE URBAN
Petitioner,

v.

THE HONORABLE DAVID HARDY, JUDGE OF THE CIRCUIT COURT OF
KANAWHA COUNTY
Respondent.

_____

Petition for a Writ of Prohibition

WRIT DENIED

_____

Submitted: September 23, 2025
Filed: November 12, 2025

John Sullivan, Esq.
Deputy Chief Public Defender
Jesse L. James, Esq.
Assistant Public Defender
Charleston, West Virginia
Counsel for the Petitioner

John B. McCuskey, Esq.
Attorney General
Andrea Nease, Esq.
Deputy Attorney General
Sandra M. Walls, Esq.
Assistant Attorney General
Charleston, West Virginia
Counsel for the Respondent

SENIOR STATUS JUSTICE HUTCHISON delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1.      "'A writ of prohibition will not issue to prevent a simple abuse of discretion by a trial court.  It will only issue where the trial court has no jurisdiction or having such jurisdiction exceeds its legitimate powers.  W. Va. Code 53-1-1.'  Syllabus Point 2, *State ex rel. Peacher v. Sencindiver*, 160 W. Va. 314, 233 S.E.2d 425 (1977)." Syl. Pt. 1, *State ex rel. Healthport Technologies, LLC v. Stucky*, 239 W. Va. 239, 800 S.E.2d 506 (2017).

2.      "In determining whether to entertain and issue the writ of prohibition for cases not involving an absence of jurisdiction but only where it is claimed that the lower tribunal exceeded its legitimate powers, this Court will examine five factors:  (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impression.  These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue.  Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight." Syl. Pt. 4, *State ex rel. Hoover v. Berger*, 199 W. Va. 12, 483 S.E.2d 12 (1996).

3. "'The provisions of the Constitution of the State of West Virginia may, in certain instances, require higher standards of protection than afforded by the Federal Constitution.' Syllabus Point 2, *Pauley v. Kelly*, 162 W. Va. 672, 255 S.E.2d 859 (1979)." Syl. Pt. 1, *State v. Bonham*, 173 W. Va. 416, 317 S.E.2d 501 (1984).

4. A circuit court's ruling on involuntarily administering medication to a defendant for competency restoration purposes must follow the four-part test established in *Sell v. United States*, 539 U.S. 166 (2003): (1) first, a court must find that important governmental interests are at stake; (2) second, the court must conclude that involuntary medication will significantly further those concomitant state interests; (3) third, the court must conclude that involuntary medication is necessary to further those interests; and (4) fourth, the court must conclude that administration of the medication is medically appropriate, *i.e.*, in the patient's best medical interest in light of his or her medical condition.

5. The State has the burden of proof to demonstrate, by clear and convincing evidence, that it has satisfied the four-part *Sell* test in a case where it seeks to forcibly medicate a defendant solely to render that individual competent to stand trial.

**HUTCHISON, Justice**:

The petitioner, Aaron Jimmie Urban, seeks a writ of prohibition to prohibit the enforcement of an order entered by the Circuit Court of Kanawha County ordering that he be involuntarily medicated for the purpose of competency restoration. In support of his petition seeking extraordinary relief, the petitioner asserts that our state constitution provides him with greater protections than those found in the federal constitution.

After finding the petitioner incompetent to stand trial on charges ranging from grand larceny to child neglect creating a substantial risk of serious bodily injury or death, among others, the circuit court ordered the petitioner committed to a state hospital for competency restoration services. After the petitioner refused medication that his treatment team believed would be beneficial in restoring his competency, the hospital sought approval to involuntarily administer medication to the petitioner. By order entered on September 20, 2024, the circuit court ordered that the hospital could involuntarily medicate him for the purpose of competency restoration to stand trial.

After careful review of the record before us, the parties' briefs and oral arguments, and the applicable law, we find that the circuit court properly applied the test found in *Sell v. United States*, 539 U.S. 166 (2003) to the facts of this case. Accordingly, we deny the petitioner's petition seeking a writ of prohibition.

# I. FACTUAL AND PROCEDURAL HISTORY

During the January 2023 term of court, the petitioner was indicted by a Kanawha County grand jury on charges of first-degree robbery, use or presentment of a firearm during the commission of a felony, fleeing with reckless indifference to the safety of others, child neglect creating a substantial risk of serious bodily injury or death, grand larceny, and misdemeanor prohibited person in possession of a firearm. After failing to appear for his initial arraignment, the petitioner was apprehended, and he appeared for his arraignment on July 19, 2023. Statements made by the petitioner during his arraignment caused the circuit court some concern about his competency, so the arraignment was continued. Thereafter, counsel for the petitioner filed a motion for a competency evaluation [1] and the circuit court ordered the petitioner to undergo an outpatient psychological evaluation to determine his competency to stand trial.[2]

---

[1] The motion indicated that the petitioner "may have mental health issues which impact his ability to understand the legal issues in his case and participate in his own defense."

[2] The circuit court asked the evaluator to determine:

(1) Is [the petitioner], by virtue of mental incapacity, unable to consult with his attorney and to assist in the preparation of his defense with a reasonable degree of rational understanding of the nature and object of the proceedings against him? If so, is there a substantial likelihood that he will attain such capacity within six months from [that] date?

(2) Was the [petitioner], on [the date of his alleged crimes], suffering from a mental disease or defect to the extent that he lacked substantial capacity

At a hearing held on November 15, 2023, Steven Cody, Ph.D., provided testimony about the petitioner's competency evaluation that caused counsel to move for a supplemental psychological evaluation, to which the State did not object. The circuit court granted the motion and ordered that Dr. Cody conduct the supplemental evaluation. Following the receipt of Dr. Cody's supplemental psychological evaluation, the circuit court found that the petitioner was "not competent to stand trial" pursuant to West Virginia Code § 27-6A-1, which requires a criminal defendant to possess the ability "to consult with his or her attorney with a reasonable degree of rational understanding, including a rational and factual understanding of the procedure and charges against him or her."[3] In addition, the circuit court found that there was "a substantial likelihood that the [petitioner] will attain competency within the next ensuing ninety (90) days" and committed the petitioner to William R. Sharpe, Jr. Hospital (hereinafter "Sharpe Hospital") for competency restoration services for a period not to exceed ninety days.[4]

---

either to appreciate the criminality (wrongfulness) of his conduct or to conform his conduct to the requirements of the law?

[3] The circuit court's order with these findings was entered on January 19, 2024 in the "Amended Order on Defendant's Competency to Stand Trial."

[4] The circuit court's order committing the petitioner to Sharpe Hospital for competency restoration services was entered on January 19, 2024, but he was not admitted to the hospital until March 14, 2024. In the interim, the petitioner asked his counsel to file a motion seeking to allow him to proceed as a self-represented litigant, and the circuit court held a hearing on the motion. Ultimately, the circuit court denied the petitioner's motion.

3

The petitioner was admitted to Sharpe Hospital on March 14, 2024, for competency restoration services. On June 7, 2024, the Chief Medical Officer at Sharpe Hospital reported to the circuit court that "additional time was needed to attempt to attain [the petitioner's] competency to stand trial." The circuit court agreed and ordered an additional ninety (90) days of competency restoration services. On August 8, 2024, Colleen M. Lillard, Ph.D., the Statewide Forensic Clinical Director, forwarded a request by the petitioner's attending psychiatrist at Sharpe Hospital, Dr. Aynampudi, seeking approval to involuntarily medicate the petitioner.

According to the request, although the petitioner's treatment team initially felt that he would benefit from psychotropic medications, they did not prescribe the medications because the petitioner was attending his competency group sessions, and he had indicated his willingness to participate in an evaluation to determine whether he had been restored to competency. Later, the petitioner refused to undergo that evaluation, and he also refused to attend competency group sessions after May 16, 2024. Thereafter, the petitioner's treatment team prescribed paliperidone, a medication that it believed would help his thought process. Although the petitioner took paliperidone "for a brief period," initially, he had since refused the paliperidone, which his treatment team believed would help his thought process. The request noted that the petitioner had been diagnosed with delusional disorder and included a detailed, proposed treatment plan, which initially offered the petitioner paliperidone orally. The plan indicated that if the petitioner continued to refuse this medication, he would be administered a long-acting injection of

4

paliperidone on a specific schedule.[5] The request noted that the petitioner lacked any "comorbidities that would contraindicate psychiatric medications," and identified the potential side effects of paliperidone.[6]

The hearing on Sharpe Hospital's request to involuntarily medicate the petitioner took place on September 19, 2024. Both Dr. Aynampudi and the petitioner testified. According to Dr. Aynampudi, the petitioner initially attended competency restoration group sessions, but he stopped attending those on or about May 16, 2024. Dr. Aynampudi further testified that the petitioner then refused paliperidone and also refused to participate in his competency evaluation. These refusals led to Sharpe Hospital's request to involuntarily medicate the petitioner. As noted *supra*, under the proposed treatment plan, the petitioner would be offered paliperidone orally, which Dr. Aynampudi testified is an anti-psychotic medication that helps with delusions. If the petitioner refused the oral medication, he would be given long-acting injectables. Dr. Aynampudi estimated that the petitioner would receive a maximum of three injections. Dr. Aynampudi testified to a reasonable degree of medical certainty that the petitioner would not be able attain

[5] If the petitioner continued in his refusal to take paliperidone orally, he would be given a long-acting injectable of paliperidone (234 mg) on Day 1. On Day 8, the petitioner would be given another long-acting injectable of paliperidone (156 mg), and on Day 38 and every thirty days thereafter, he would be given another injectable of paliperidone (234 mg).

[6] According to the request, the "side effects of Paliperidone include but are not limited to nausea, vomiting, headache, constipation, and weight gain."

competency without medication to treat his delusional disorder, and that with appropriate medication, there was a substantial likelihood that competency could be restored within the time remaining for the restoration of competency.[7] The petitioner testified that he had been misdiagnosed and confirmed that he was refusing the medication offered by his treatment team. The petitioner also confirmed that he took the medication at issue on one occasion and refused it thereafter because of the adverse side effects.[8]

By order entered on September 20, 2024, the circuit court granted the request by Sharpe Hospital to involuntarily medicate the petitioner should he continue to refuse treatment in order to regain competency to stand trial. In making its decision, the circuit court relied upon the United States Supreme Court's decision in *Sell v. United States*, 539 U.S. at 166, which sets forth a four-part test employed under the Due Process Clause of the Fifth Amendment to the United States Constitution to determine whether mentally ill criminal defendants may be involuntarily medicated to render them competent to stand trial. On September 24, 2024, the petitioner filed the instant petition for writ of prohibition

---

[7] West Virginia Code § 27-6A-3(g)(1) contains the following limitation with respect to competency restoration: "a defendant may not be held in the mental health facility or state hospital for a period longer than 240 days for competency restoration treatment." We note that during the September 19, 2024, hearing, there was a discussion about the time remaining for competency restoration services for the petitioner. As the petitioner did not assign error to the calculation, we do not address the time remaining for competency restoration services here.

[8] The petitioner testified that the medication made him feel "really tired and drowsy" and it made him "not want to work out" or "get out of bed."

seeking to prohibit enforcement of the circuit court's order permitting Sharpe Hospital to involuntarily medicate him.[9]  On March 13, 2025, we granted a rule to show cause and scheduled this matter for oral argument.

## II.  STANDARD OF REVIEW

The petitioner asserts that the circuit court exceeded its legitimate powers by ordering that he be involuntarily medicated for the purpose of competency restoration.  "'A writ of prohibition will not issue to prevent a simple abuse of discretion by a trial court.  It will only issue where the trial court has no jurisdiction or having such jurisdiction exceeds its legitimate powers. W. Va. Code 53-1-1.' Syllabus Point 2, *State ex rel. Peacher v. Sencindiver,* 160 W. Va. 314, 233 S.E.2d 425 (1977)."  Syl. Pt. 1, *State ex rel. Healthport Technologies, LLC v. Stucky*, 239 W. Va. 239, 800 S.E.2d 506 (2017).

Because the petitioner asserts that the circuit court exceeded its legitimate powers, we are guided by our prior holding in *State ex rel. Hoover v. Berger*, 199 W. Va. 12, 483 S.E.2d 12 (1996):

> In determining whether to entertain and issue the writ of prohibition
> for cases not involving an absence of jurisdiction but only where it is claimed

---

[9] Prior to the circuit court's ruling at issue in the instant case, the petitioner, proceeding as a self-represented litigant, filed an "Emergency Writ of Prohibition" in this Court asserting, among other things, that (1) he was not arraigned within the proper timeframe; and (2) he had refused the services of his court appointed counsel because he was under a "Private Sector Partnership through Corporation aggregate in the National Intelligence Community" and that he was only allowed to disclose "certain information to authorized representatives of members pursuant to (The Classified Information Act)."  By order entered on December 6, 2024, we refused the petitioner's writ.

that the lower tribunal exceeded its legitimate powers, this Court will examine five factors: (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impression. These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue. Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight.

*Id.* at Syllabus Point 4.

With these standards in mind, we turn to the parties' arguments.

## III. ANALYSIS

The underlying facts that precipitated the petitioner's request for extraordinary relief are undisputed. On January 19, 2024, the circuit court entered an order finding that the petitioner was not competent to stand trial. In addition, the circuit court found that there was a substantial likelihood that the petitioner would obtain competency within three months. Therefore, the circuit court committed the petitioner to Sharpe Hospital for competency restoration services. On August 8, 2024, Sharpe Hospital sought approval to involuntarily medicate the petitioner. After holding an evidentiary hearing, the circuit court granted the request to involuntarily medicate the petitioner.

8

Before this Court, the petitioner contends that the circuit court lacked the authority to enter an order permitting Sharpe Hospital to involuntarily medicate him for competency restoration. He maintains that there is no judicial authority explicitly authorizing circuit courts to issue an order regarding involuntary medication and the circuit court's reliance upon the four-part *Sell* test to conclude that he could be involuntarily medicated was error. The State counters and argues that the statutory framework for competency restoration provides circuit courts with the authority to order defendants to be involuntarily medicated. The State further argues that the *Sell* test is the appropriate method for deciding when a defendant can be involuntarily medicated for the purpose of restoring his or her competency to stand trial.

A. *Statutory Authority to Order the Involuntarily Administration of Medication*

Initially, the petitioner contends that the circuit court lacked the authority to enter the order at issue. We disagree. A review of the statutory framework regarding competency restoration belies the petitioner's argument. West Virginia Code § 27-6A-1 defines "competency restoration" as follows:

> "Competency restoration" means the treatment or education process for attempting to restore a criminal defendant's ability to consult with his or her attorney with a reasonable degree of rational understanding, including a rational and factual understanding of the court proceedings and charges against the person. Competency restoration services may be provided in a

9

jail-based, outpatient, or inpatient setting as may be ordered by the court.

With respect to competency restoration services, West Virginia Code § 27-6A-3(d), provides circuit courts with the following authority:

> If at any point in the proceedings the defendant is found not competent to stand trial and substantially likely to attain competency, the court of record *shall* in the same order, upon the evidence, make further findings as to whether the defendant, in order to attain competency, should receive outpatient competency restoration services or if the attainment of competency requires inpatient management in a mental health facility or state hospital.

(emphasis added). There appears to be no dispute that the circuit court complied with this statute. In its January 19, 2024, order, the circuit court found that the petitioner was not competent to stand trial, and that there was a substantial likelihood that the petitioner would "attain competency within the next ensuing three (3) months[.]" The circuit court then ordered that the petitioner be committed to Sharpe Hospital.

Importantly, the circuit court committed the petitioner to Sharpe Hospital pursuant to West Virginia Code § 27-6A-3. The medications and medical management of individuals, such as the petitioner, who are court ordered to a state hospital pursuant to West Virginia Code § 27-6A-3 are addressed in West Virginia Code § 27-6A-10, which provides that:

10

> [a]n individual with health care decision-making capacity may refuse medications or other management *unless court-ordered to be treated*, or unless a treating clinician determines that medication or other management is necessary in emergencies or to prevent danger to the individual or others: Provided *,* That medication management intended to treat an individual's condition that causes or contributes to incompetency shall constitute treatment.

(emphasis added).

This Court has held that in deciding the meaning of a statutory provision, "[w]e look first to the statute's language. If the text, given its plain meaning, answers the interpretive question, the language must prevail and further inquiry is foreclosed." *Appalachian Power Co. v. State Tax Dep't of W. Va*, 195 W. Va. 573, 587, 466 S.E.2d 424, 438 (1995); *see also* Syl. Pt. 2, *Crockett v. Andrews*, 153 W. Va. 714, 172 S.E.2d 384 (1970) ("Where the language of a statute is free from ambiguity, its plain meaning is to be accepted and applied without resort to interpretation."); and Syl. Pt. 2, *State v. Epperly*, 135 W. Va. 877, 65 S.E.2d 488 (1951) ("A statutory provision which is clear and unambiguous and plainly expresses the legislative intent will not be interpreted by the courts but will be given full force and effect.").

We find that the plain language of West Virginia Code § 27-6A-10 permits a circuit court to order the involuntary administration of medication to an individual under certain specified circumstances. Although this statute does not include the term "involuntary medication," we find that it nonetheless authorizes circuit courts to order a

11

criminal defendant who has been deemed incompetent to stand trial to be medicated regardless of his or her capacity to make health care decisions. The statute acknowledges that individuals such as the petitioner may refuse medication *unless* one of the following two circumstances is present: (1) the individual has been court-ordered to be treated; or (2) a "treating clinician determines that medication or other management is necessary in emergencies or to prevent danger to the individual or others." *Id.* As the statute contemplates, the petitioner in the instant case was court ordered to be treated, and we conclude, therefore, that the circuit court possessed the authority to order the involuntary administration of medication for competency restoration. For these reasons, we reject the petitioner's first argument.

## B. The Sell Test

Having concluded that the circuit court had the statutory authority to enter the order at issue, we now consider the petitioner's argument that the circuit court's reliance upon *Sell* was misplaced because he is afforded higher standards of protection under the West Virginia Constitution.

In *Sell,* the Supreme Court "considered the delicate balance between a person's liberty interests in being free from unwanted medication and the societal interest in restoring to competency and bringing to trial a person accused of committing a serious crime." *People In Interest of Joergensen*, 524 P.3d 293, 295 (Colo. 2022). Although the

12

Supreme Court ultimately vacated an order authorizing the administration of antipsychotic drugs in *Sell*, it set forth a four-part test under the Fifth Amendment's Due Process Clause that must be satisfied before the federal government can forcibly medicate a criminal defendant for the purpose of rendering the defendant competent to stand trial.[10] This four-part test is as follows:

> First, a court must find that *important* governmental interests are at stake. . . . Second, the court must conclude that involuntary medication will *significantly further* those concomitant state interests. . . . Third, the court must conclude that involuntary medication is *necessary* to further those interests. . . . [and] Fourth, [] the court must conclude that administration of the drugs is *medically appropriate, i.e.*, in the patient's best medical interest in light of his medical condition.

*Sell*, 539 U.S. at 180-181.

The petitioner argues that the circuit court erred by relying on *Sell* because the West Virginia Constitution affords him, as a criminal defendant, additional constitutional protections that exceed the federal constitutional protections encompassed in the four-part *Sell* test. We disagree and find the circuit court properly relied upon and applied the *Sell* test.

---

[10] The Fifth Amendment's Due Process Clause applies only to the federal government. It is the Fourteenth Amendment's Due Process Clause that applies against the States. However, the rights protected by the two due process clauses are co-extensive. *State ex rel. Riley v. Rudloff*, 212 W. Va. 767, 778 n.12, 575 S.E.2d 377, 388 n.12 (2002).

13

When analyzing the first factor of the *Sell* test, the circuit court found, and we agree, that the State's interest in restoring the petitioner's competency "qualifie[d] as an important governmental interest" and that involuntarily medicating the petitioner "would significantly further that interest based upon the likelihood that treatment would expeditiously render the [petitioner] competent to stand trial and assist in conducting a defense." As we noted over fifty years ago, "the State has a legitimate interest in determining the competency of a defendant to stand trial [and] [s]hould a defendant be incompetent to stand trial, the State needs to be afforded an opportunity to restore the defendant's competency so that he may stand trial." *State ex rel. Walker v. Jenkins*, 157 W. Va. 683, 689, 203 S.E.2d 353, 357 (1974); *see also United States v. Bush*, 585 F.3d 806, 813 (4th Cir. 2009) ("It surely is not an overstatement to observe that the government's ability to enforce the criminal laws in accordance with due process is the foundation on which social order rests and from which individual liberties emanate. Thus, when an individual commits a crime, he forfeits his liberty interests to the extent necessary for the government to bring him to trial.").

When analyzing the first *Sell* factor, the Supreme Court also recognized that "[t]he Government's interest in bringing to trial an individual accused of a serious crime is important." *Sell* at 180. According to his indictment, the petitioner is accused of, *inter alia*, presenting a shotgun to an employee of 7-Eleven, Inc. during his first-degree robbery of that establishment. This accusation clearly constitutes a "serious crime."

14

With respect to the second *Sell* factor, the circuit court found that the involuntary administration of medication "would significantly further" the State's interest in restoring the petitioner's competency "based upon the likelihood that [the] treatment would expeditiously render the [petitioner] competent to stand trial and assist in conducting a defense." This finding is supported by Dr. Aynampudi's testimony that with appropriate medication, there is a substantial likelihood that competency could be restored within the time remaining for the restoration of competency.

The circuit court addressed the final two factors by finding that "the medication is medically appropriate[11] and necessary[12] to further the State's interest in restoring the [petitioner's] competency to stand trial." The circuit court's conclusion that involuntary medication is necessary, requires a finding that "alternative, less intrusive treatments are unlikely to achieve substantially the same results." *Id* at 181. Dr. Aynampudi's uncontradicted testimony that the petitioner had stopped attending competency restoration groups, had refused medication, and had refused to participate in a competency evaluation supports the circuit court's conclusion that the petitioner "had stopped participating in all competency restoration therapies." The petitioner's refusal to

---

[11] A finding that the administration of the medication is medically appropriate is the fourth factor required in the *Sell* test.

[12] The third factor of the *Sell* test requires a court to "conclude that involuntary medication is *necessary* to further" the government's interests. *Sell*, 539 U.S. at 181.

15

participate in less intrusive treatments demonstrates that those treatments are unlikely to achieve the same results as the medication.

Importantly, before this Court, the petitioner does not assert that the circuit court misapplied the *Sell* test, nor does the petitioner assert that the circuit court erred in finding that that State satisfied the *Sell* test. Instead, he asks this Court to find that the West Virginia Constitution requires greater protections than are required by the *Sell* test. The enhanced guarantees to which the petitioner refers are the rights of "pursuing and obtaining happiness and safety," which are found in Article 3, § 1 of the West Virginia Constitution. The petitioner correctly notes that these protections are not found in the United States Constitution, and he also points out that this Court has recognized that "'[t]he provisions of the Constitution of the State of West Virginia may, in certain instances, require higher standards of protection than afforded by the Federal Constitution.' Syllabus Point 2, *Pauley v. Kelly*, 162 W. Va. 672, 255 S.E.2d 859 (1979)." Syl. Pt. 1, *State v. Bonham*, 173 W. Va. 416, 317 S.E.2d 501 (1984). According to the petitioner, the right "of pursuing and obtaining happiness and safety" is applicable to medical decisions and that "[e]very person has a right to decide whether to take medication according to their own choices about the impact it would have on their happiness and safety."

We recognize that "[t]he forcible injection of medication into a nonconsenting person's body . . . represents a substantial interference with that person's liberty." *Riggins v. Nevada*, 504 U.S. 127, 134 (1992) (quoting *Washington v. Harper*, 494

16

U.S. 210, 229 (1990)). However, as the State notes, the interest to refuse the unwanted administration of antipsychotic medication is not absolute. *See Washington v. Harper*, 494 U.S. 210 (1990) (holding that a prison policy permitting the State of Washington to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if he is dangerous to himself or others and the treatment is in his medical interest, comported with substantive due process requirements); *Riggins v. Nevada*, 504 U.S. at 134 (finding that pretrial detainee's constitutionally protected liberty interest "in avoiding involuntary administration of antipsychotic drugs" can be overcome by an essential or overriding state interest). Further, pursuant to *Sell*, it is possible for "a mentally ill defendant who is not dangerous to himself or others within the meaning of *Harper* [] [to] be forcibly medicated for the sole purpose of rendering him competent to stand trial." *U.S. v. Watson,* 793 F.3d 416, 419 (4th Cir. 2015) (internal citation omitted).

Despite asserting that the West Virginia Constitution requires greater protections than are required by the *Sell* test, the petitioner failed to propose any additional procedures or factors that should be considered over and above those contemplated by the *Sell* test.[13]

---

[13] In response to questioning during oral argument, the petitioner identified additional requirements that he believes should be required if this Court adopts the *Sell* test. The petitioner argued, among other things, that this Court should apply the clear and convincing standard of proof and require specificity in the circuit court's findings regarding medications. Except in extraordinary or exceptional circumstances, this Court,

As noted *supra*, the *Sell* test requires (1) a finding that important governmental interests are at stake; (2) a conclusion that involuntary medication will significantly further the concomitant state interests and that the administration of the medication is substantially likely to render the defendant competent to stand trial without side effects that will significantly interfere with the defendant's ability to assist counsel; (3) a finding that involuntary medication is necessary to further those interests; and (4) a finding that the administration of the medication is medically appropriate. *Sell* at 180-181.

> limit[s] a party to asserting the issues and arguments in an appeal to those clearly set forth in a party's brief … because raising an issue or argument in an appellate brief provides the necessary notice to both this Court and the opposing party as to what they confront so each can adequately prepare and discharge their respective responsibilities.

*Argus Energy, LLC v. Marenko*, 248 W. Va. 98, 103, 887 S.E.2d 223, 228 (2023). For reasons that will be discussed, *infra*, we will address the proper standard of proof. However, to the extent that the petitioner now seeks to assert that the circuit court's order was insufficient in some manner, we remind the parties that

> A party seeking to petition this Court for an extraordinary writ based upon a non-appealable interlocutory decision of a trial court, must request the trial court set out in an order findings of fact and conclusions of law that support and form the basis of its decision. In making the request to the trial court, counsel must inform the trial court specifically that the request is being made because counsel intends to seek an extraordinary writ to challenge the court's ruling. When such a request is made, trial courts are obligated to enter an order containing findings of fact and conclusions of law. Absent a request by the complaining party, a trial court is under no duty to set out findings of fact and conclusions of law in non-appealable interlocutory orders.

Syl. Pt. 6, *State ex rel. Allstate v. Gaughan*, 203 W. Va. 358, 508 S.E.2d 75 (1998).

The *Sell* test is rigorous; it recognizes that involuntarily administering psychiatric drugs to an unwilling person raises significant constitutional issues. Further, *Sell*, "requires an individualized, fact-based examination of each case and each defendant." *Cotner v. Liwski*, 403 P.3d 600, 605 (Ariz. 2017) (internal citation omitted). Although *Sell* permits forcible medication when its test is satisfied, the Supreme Court cautioned that "those instances may be rare." *Sell*, 539 U.S. at 180. The petitioner has not identified how *Sell* is inadequate under the West Virginia Constitution. We find that the rigorous *Sell* test satisfies the due process standards articulated in the West Virginia Constitution.

For these reasons, we hold that a circuit court's ruling on involuntarily administering medication to a defendant for competency restoration purposes must follow the four-part test established in *Sell v. United States*, 539 U.S. 166 (2003): (1) first, a court must find that important governmental interests are at stake; (2) second, the court must conclude that involuntary medication will significantly further those concomitant state interests; (3) third, the court must conclude that involuntary medication is necessary to further those interests; and (4) fourth, the court must conclude that administration of the medication is medically appropriate, *i.e.*, in the patient's best medical interest in light of his or her medical condition. Although we adopt the *Sell* test without expansion, we caution that "[f]orcible medication is not justified every time an incompetent defendant refuses treatment; on the contrary, 'those instances may be rare.'" *Watson*, 793 F.3d at 419.

Having adopted the *Sell* test, we now turn to the proper standard of proof required in cases involving the involuntary administration of medication for competency restoration. Not having the benefit of any argument regarding the standard of proof before it below, the circuit court applied the preponderance of the evidence standard of proof when making its ruling during the September 19, 2024, hearing. Most other courts that have examined this issue, though, have concluded that a higher threshold is mandated. *See State v. Holden*, 110 A.3d 1237, 1243 (Conn. Supp. 2014) ("[M]ost courts in other jurisdictions have required the government to prove the *Sell* factors by clear and convincing evidence."). The right to personal autonomy, including the right to make judgments about one's medical care is a highly prized (albeit not absolute) right under the federal and West Virginia Constitutions. *Baughman v. WalMart Stores, Inc.*, 215 W. Va. 45, 49, 592 S.E.2d 824, 828 (2003) ("The principle and right of personal autonomy and privacy is just as important as the more traditional civil rights of freedom of assembly, speech, and religion."). Consequently, "[t]o 'minimize[] the risk of erroneous decisions in this important context,'[the Fourth Circuit Court of Appeals] set a deliberately high standard for the government to satisfy before it may forcibly medicate solely to render an inmate competent to stand trial." *Watson*, 739 F.3d at 419-420 (internal citation omitted). This heavy burden requires "'evidence of such weight that it produces in the mind of the trier of fact a firm belief of conviction, without hesitancy, as to the truth of the allegations sought to be established,' or 'evidence that proves the facts at issue to be highly probable.'" *Id* at 420. (internal citations omitted).

20

Given the important interests at stake and seeing no reason to depart from the reasoning above, we likewise hold, as do most of our sister courts, that the State has the burden of proof to demonstrate, by clear and convincing evidence, that it has satisfied the four-part *Sell* test in a case where it seeks to forcibly medicate a defendant solely to render that individual competent to stand trial. As stated, the circuit court did not apply the clear and convincing standard, but only the preponderance standard. Ordinarily, when a trial court applies an incorrect legal standard, the appellate court remands to the lower court with directions for it to apply the proper standard. There is, however, a limited exception to this rule. Where the evidence is such that it supports only one conclusion under the proper standard, an appellate court may affirm without remanding. *See Wright v. Lassiter*, 921 F.3d 413, 418-419 (4th Cir. 2019) ("While we usually remand when the district court has misapplied the relevant legal standard after a bench trial, we may affirm when the evidence permits only one conclusion."); *see also Raleigh Wake Citizens Ass'n v. Wake Cnty. Bd. of Elections*, 827 F.3d 333, 345 (4th Cir. 2016) (quoting *Pullman–Standard v. Swint*, 456 U.S. 273, 292 (1982)) ("[W]hen 'the record permits only one resolution of the factual issue,' remand is unnecessary, and we may rule based on the record before us.").

As discussed above, at the time the circuit court issued its ruling, it found that the State had an important interest in bringing the petitioner, who is charged with serious crimes, to trial. Further, the circuit court had the benefit of Sharpe Hospital's detailed, proposed treatment plan as well as the uncontradicted, expert testimony of Dr. Aynampudi that there is a substantial likelihood that the petitioner's competency could be

21

restored within the remaining allotted time if Sharpe Hospital could administer the appropriate medication to the petitioner. Although Sharpe Hospital tried less intrusive treatments such as competency group sessions, the petitioner refused those treatments after approximately two months. Dr. Aynampudi also testified that paliperidone is an antipsychotic medication that is appropriate for the class of disorders that encompasses delusional disorder. Finally, the petitioner produced no expert evidence at the hearing to contradict Dr. Aynampudi's expert opinion (indeed, the petitioner produced no expert testimony at all). Having carefully reviewed the record, we find that the only conclusion that can be reached is that the State satisfied its burden by clear and convincing evidence. For this reason, remand is unnecessary.

Based on the foregoing, we find that the petitioner is not entitled to the extraordinary relief that he seeks. "Although all five [*Hoover*] factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight." *Hoover* at Syl. Pt. 4, in part. Having found no error, we also find that the additional *Hoover* factors do not warrant consideration.

## IV. CONCLUSION

The petition for a writ of prohibition is denied.

Writ Denied.

22